## EBENEZER STEDMAN *et al. versus* OLIVER G. LANE.

By an agreement made between the defendant and the plaintiffs, the defendant "has bargained and sold unto" the plaintiffs "the hull of a new ship he is now building," and he "agrees to finish the said ship in a faithful and workmanlike manner." The instrument then, after specifying various things to be furnished by the defendant and the modes in which different parts of the work are to be done, proceeds thus : "All the materials used on the hull of said vessel shall be good and fitting a first-rate ship of the kind. Every part of the hull to be completed." *Held,* that the agreement contained a contract of sale of the hull in its then imperfect state, and a contract of manufacture, and that these covenants of the defendant did not refer back to the quality of the materials and workmanship already used in and upon the hull before the sale, but applied only to what remained to be furnished and done in completing the vessel.

ON a case stated it appeared, that this action was covenant broken, brought upon the following contract, dated the 15th of March, 1833 :

" By this agreement made and concluded this day between Oliver G. Lane, of Gloucester, &c. on one part, and Ebenezer Stedman, William B. Titcomb, Edward Titcomb junior and Samuel Titcomb, all of Newburyport, &c. on the other part, to say, the said Oliver G. Lane has bargained and sold unto the above named parties in the second part the hull of a new ship he is now building in Gloucester, Squam, of about 330 tons, more or less, for the sum of $ 38·50, government tonnage ;— $ 1000 in advance on signing this agreement, $ 1000 in twenty days from date, and the residue of one half of the whole amount

that the hull of said ship may amount to, at the above rate, in three days after said ship is launched and completed in manner agreed on, and the other half part in three payments, one third in three months, one third in six months, and one third in nine months, from the time said parties of the second part receive and commence rigging said ship. And the said Lane agrees to finish the said ship in a faithful and workmanlike manner; and agrees to furnish the wheel, capstan rim, and top or head, and one of Nicholson's patents for windlass, gilt billet-head, and common trail-board and carved moulding for the stern, not exceeding $30 in cost to said Lane. And further, said Lane agrees to finish between decks with twelve iron knees and six wooden ones, and paint the sides of the ship inside and out with two coats of paint above the bottom plank, and either pay the upper deck with varnish, or furnish enough to do it. Cabin to be finished with mahogany in a neat and snug style, and varnished with two coats of varnish (copal). All the materials used on the hull of said vessel shall be good and fitting a first rate ship of the kind. Every part of the hull to be complete, bottom caulked and graved. The contracting parties hereby mutually bind themselves, their heirs and assigns, to the full and faithful performance of the above contract, in the penal sum of $2000."

At the time of the execution of the agreement, the ship stood upon the stocks or ways, in the possession of the defendant, in an unfinished state. She was framed and planked on the outside, and nearly all the treenails driven, which were at any period in the course of her construction driven. She was ceiled on the inside, but her air-streaks and plank-shears were left open and her upper and lower decks were laid, and the spiking of said ceiling was done, and that of the decks was in progress, but not completed. In the stern, the lower deck was laid flush with one of the transoms, and the stern was wholly planked on the outside and not on the inside, nor was the cabin work done or the after bulkheads built. The caulking of the ship was just begun. All the bolts were driven, up to the bilge-streaks, and the principal part of the woodend bolts were driven. The buttbolts above the bilge-streak were, for the principal part, not driven. The rudder was made and

fastened together, and Samuel Titcomb saw it. The rudder-braces were not made and were not attached to the ship. The ship remained on the stocks in the hands of the defendant or his servants, and in the process of construction, until the 3d of May following the date of the agreement, when she was launched.

On the day before the agreement was made and executed, Samuel Titcomb went to Gloucester for the purpose of seeing the ship ; and he inspected her in the presence of the defendant's agent. On the next day this agent went to Newburyport to see the parties, and after a conversation the agreement was made and executed by the parties to it, at Newburyport.

The question submitted to the Court concerned the construction of the agreement. If the Court should be of opinion, that the covenants extended to the whole ship, as well what had been done, as what remained to be done for the finishing and completing her at the time when the agreement was made, then a trial was to be had by a jury ; and if they should be of opinion, that the covenants applied only to what remained to be done on the ship, then the case was to go to assessors or referees.

The case was argued in writing, by *Cushing*, for the plaintiffs, and *Saltonstall* and *Rantoul*, for the defendant.

MORTON J. drew up the opinion of the Court. The only question in this case arises upon the construction of the instrument declared on. It was probably written by one of the parties, and not by a professional scrivener. Although not prepared with technical formality, yet it evinces no want of intelligence, nor is it in its general objects and stipulations obscure or ambiguous. But in relation to the point in controversy, we have had great difficulty in ascertaining, to the satisfaction of our own minds, the true meaning of the language used by the parties.

This difficulty is caused not so much by indistinctness and obscurity of expression, as by the double aspect of the instrument. It contains two distinct and somewhat dissimilar contracts. The one a contract of sale of an existing subject, and the other a contract of manufacture, for the creation of something not then in existence. And our real embarrassment con-

sists in determining what covenants attach to the one, and what to the other; or whether any of the covenants following the contract of manufacture, apply to the contract of sale.

We must premise that we have derived little aid from the numerous authorities which the research of the counsel on both sides have brought to our notice, or from their learned commentaries upon them. The principles of law which must govern our decision are well settled, and the counsel differ very little about them. It is not a question materially depending upon decided cases. We are to ascertain the intention of the parties. And we must seek it in the language of the instrument. This language must of necessity be construed with reference to external objects. And evidence of the state of the subject matter upon which it is to operate, and of all the circumstances bearing upon it, may be received and used to aid us in arriving at the true meaning of the written agreement.

The instrument unquestionably contains a contract of sale. More explicit language for that purpose could not easily have been selected. "*The said Lane has bargained and sold the hull of a new ship he is now building.*"

The general principle, that a contract of sale does not imply a warranty of the quality of the chattel sold, is well settled. The vendor is never liable for latent defects or other imperfections, unless he makes an express warranty or is guilty of fraud See the authorities collected in 3 Stark. Ev. 1660, in note.

What representations will constitute a warranty, in respect to which courts have, of late, grown more liberal, it is not necessary to consider, because in relation to the sale there is nothing which can amount to a warranty.

The doctrine of implied warranty, that the article is suitable for the purpose for which it was sold, can have no application. It would amount to no more than that she was a ship. She was sold for a ship, but not for any particular employment or trade, or course of business. The purchasers did not disclose to the vendor, if they knew, in what trade they intended to employ the ship. If they had applied to the owner for a ship for a specified business, especially if it were an unusual and extraordinary one, the seller might be holden by an implied warranty that the ship was suitable for the business. If a man buy

a horse, there can be no implied warranty, that it is a race-horse, or a saddle-horse, or a coach-horse, or a truck-horse. But if he apply for and buy the horse for either of these uses, the doctrine of implied warranty might apply. It would in fact be a virtual representation that the thing sold would answer the purpose for which it was bought, and if it would not, it would be a fraud upon the purchaser.

Here no misrepresentation or fraudulent conduct is imputed to the defendant. If the plaintiffs had intended to make any such charges, they should have brought *case* in the nature of deceit. But in this form of action that subject cannot be inquired into. And the plaintiffs have no occasion or desire to change the form of their action.

In the absence of all deception or misrepresentation we are brought to the inquiry, what is the true construction of the written contract, and do the covenants extend or refer back to the quality of the materials or workmanship of the vessel when sold ?

In every sale the vendor, by necessary implication, warrants that he owns the property which he undertakes to sell, and that the chattel sold is what he represents it to be and sells it for. But when it is open to the inspection of both parties, the vendor parts with and the purchaser receives the property as it is. If the latter is not willing to rely upon his examination and his own judgment, he should avail himself of the skill of others or require an express warranty. If he omits to do either of these, the rule *caveat emptor* applies, and he must suffer the consequence of his improvidence or neglect.

If the sale of the hull had been by one person, and the contract to finish it with another, there could have been no uncertainty. If the contract of sale had contained covenants of warranty, they would have bound the vendor, but if it had concluded without them, they could not have been implied.

But this instrument contains not only a contract of bargain and sale, but a contract of manufacture. The defendant not only sells the hull of the vessel then in an imperfect state, but he agrees to finish and complete it. And our difficulty arises from the fact, that the seller and the finisher is the same person. And it is not easy to determine whether the covenants,

in relation to the *finishing*, are confined to that object or ex-
tend to the whole subject of the contract.

After the agreement to sell, including the consideration and
the terms of payment, is fully stated, a new contract having a
new object is introduced in these words. " *The said Lane
agrees to finish the said ship in a faithful and workmanlike
manner."* — " *All the materials used on the hull shall be good
and fitting a first-rate ship of the kind. Every part of the hull
to be complete.*"

This is the substance of the second branch of this instru-
ment. The minute stipulations relative to the style of work-
manship and the materials to be used in the finishing the several
parts, are not very important ; although they may hereafter be
alluded to for the purpose of throwing some light upon the con-
struction.

The one party insists that this covenant is confined to the
agreement to *finish*, while the other contends that it extends to
both branches of the contract and amounts to a warranty of the
whole vessel. The one contends that it is *prospective*, the
other, that it is *retrospective* as well as *prospective*.

It is apparent, in the first place, that all the words may be
fully satisfied, and each one may have its natural force and
effect, upon the former construction. If the plaintiffs had be-
fore owned the hull in its unfinished state and had contracted
with the defendant in the above language to finish it, the con-
tract would have been consistent and perfect, and easily under-
stood. All that it could require of the defendant would be,
to finish all the parts then in the process of manufacture and
incomplete, and to construct those enumerated in the contract
and all others necessary to render the structure a complete and
finished hull. What remained to be done could be easily as-
certained. And the covenant would require that this should
be performed in a skilful and faithful manner, and with suitable
materials. But no one would understand that the covenant
related back to the commencement of the structure and re-
quired a revision of all the work which had been done, and the
substitution of better materials for imperfect ones which had
been used.

But the plaintiffs' counsel argues that the covenants apply to

the whole contract, as well that part relating to the sale as that relating to the manufacture ; that the stipulation, that all the materials used upon the hull shall be good, means *all* the materials which shall be upon the hull when the contract shall be fully executed and the vessel delivered ; that the language, " *every part of the hull to be complete*," necessarily refers to the time when the plaintiffs are to receive it and covers the whole ground of the contract. It is said, how can *every part* be *complete*, when some parts are imperfectly made and others are made of improper materials ?

The main force of this argument rests upon the meaning of the terms used, and especially the word *complete*. This word is somewhat ambiguous. It may mean *perfect ;* finished in a manner proper for such a subject ; or it may mean, when every part of the hull is finished according to the terms of the agreement ; when the contract is fairly executed. In the construction of ambiguous language used in deeds of conveyance, in bills of sale and contracts of every description, resort must be had to extraneous evidence of the existing state of facts to which it applies and upon which it is intended to operate.

The situation of the parties, the state of the property to be affected, and the circumstances under which the contract was made, will shed some light upon the question under consideration. The vessel was in a state peculiarly favorable for a thorough examination. She was equally open to the inspection of both parties. The plaintiffs did know or might have known, and therefore must be presumed to have known, the kind and quality of the timber and other materials used, and the manner in which the work had been done. They might not only have examined the vessel, but if they did not choose to rely upon their examination, they might have made inquiries of the owner, and if they had been deceived, they might have had a remedy for the misrepresentation.

Under these circumstances the plaintiffs bought the vessel. They then contracted with the defendant to finish it ; and took ample covenants to secure that object. Now can it be supposed the parties understood that the agreement to finish and complete the hull, imposed on the defendant an obligation to reëxamine the whole fabric and to remove timbers because they

were not of the proper size or quality, and to refasten the different parts because they were fastened with one kind of metal when another should have been used ? Did he intend to bind himself to put in a new keel, or keelson, or transom, or bilge streaks, or any other new materials in case the old was not deemed sufficient ?

The case put by the defendant's counsel is familiar and illustrative. Suppose the purchase had been of an unfinished house, with a contract to finish it, in terms similar to those used in the present case. Can it be supposed that the covenants would look back to the construction of the whole house, and require the vendor to take off pine shingles and substitute cedar ? to remove hemlock sills and replace them with oak ? or tear down the ceiling because the work was not skilfully done, and refinish it with better workmanship ? We think it is very clear that they would not. So in the case supposed by the plaintiffs' counsel, of a watch ; would the contract to finish require the seller to remove the main-spring because it was not of the best kind, and substitute a better one ? or make a new case because the former one was not sufficiently thick and strong ? We think not.

If the parties had contemplated so important a covenant as a general warranty, it may be presumed they would not have left it to implication, but would have inserted a clear and express clause to that effect. While we find them not only taking a general covenant for skill and fidelity in the workmanship and good materials, in the finishing, but entering into detailed and minute particulars in relation to the manner in which it should be done, we cannot suppose that they would have left weighty stipulations to doubtful construction.

There is something too in the form of the expressions used, which may throw some light on the subject. While the language in relation to the sale is retrospective, that in relation to the finishing is prospective. The sale is spoken of as a fact that is past. The said Lane *has bargained and sold* &c. The agreement to finish necessarily looks forward. It is a stipulation of something then to be done. And all the covenants which follow are executory and seem to contemplate acts then afterwards to be performed and not to contain stipulations to be

applied to things already provided and acts already done.  The <span>Stedman<br>v.<br>Lane.</span> materials *shall be*, not *are* good.   They *shall be* fitting a first-rate ship of the kind.   Of what kind ?   No description had been given.

This covenant, if it looks forward to the future work upon the ship, is plain and intelligible ; but if it also looks back so as to cover her whole construction, is indefinite and uncertain. A contract to build a ship and to put in materials fitting a first-rate ship of the kind, without indicating the kind of ship to be built, would be an absurdity of which we. cannot suppose that intelligent men would be guilty.   But a contract to finish a ship already nearly completed, and to do work and use materials fitting a first-rate ship of the kind, would be certain, intelligible and reasonable.

The kind is fixed by the article sold.   The finishing shall correspond with the structure thus far manufactured.   Every part of the hull to be complete.   Whatever remains to finish the hull, so that it shall be in keeping throughout and be an entire hull, is to be done.   We would not place too great reliance upon verbal criticism or the grammatical structure of sentences; yet in a very doubtful construction they may legitimately be resorted to, and have sufficient weight to turn the scale one way or the other.

To conclude, upon the most careful examination which we have been able to give this doubtful question, whether we regard the nature and scope of the contract, the general object of the parties, or the critical and grammatical construction of the language used by them, we are inclined to the opinion, that the covenants do not extend to the contract of sale ; and that there is no warranty of the vessel as it was at the time of the sale.   The plaintiffs purchased and took her as she was.   If improper materials had been used in, or unskilful work done upon her, the defects and their consequences must fall on the plaintiffs.   The defendant covenanted to finish her.   His contract was to take effect and operate from that time.   Whatever remained to be done to make the hull complete, he was to do. Where any parts were wanting, he was to supply them.   Where any were in an unfinished state, he was to finish them.   And all this was to be done with proper materials and in a work-

manlike manner.    The covenant applied only to what remained to be done upon the hull at the date of the contract.

According to the agreement of the parties, the case must go to referees to determine whether the covenant, in this view of it, has been performed or broken, and if the latter, to assess damages for the breach of it.